**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLORADO**

Criminal Case No. 20-cr-00067-CMA

UNITED STATES OF AMERICA,

      Plaintiff,

v.

KURT VASQUEZ,

      Defendant.

---

## PLEA AGREEMENT

---

The United States of America, by and through Bryan Fields, Assistant United States Attorney for the District of Colorado and the Defendant, KURT VASQUEZ, personally and by and through his counsel, Joseph Saint-Veltri, hereby submit the following Plea Agreement pursuant to D.C. COLO. LCR 11.1 and FED. R. CRIM. P. 11(c)(1)(A) and (B):

**I.      AGREEMENT**

**A.      Defendant's Obligations**

1.      The Defendant agrees to: (1) plead guilty to Count Three of the Indictment, charging a violation of Title 21, United States Code, Section 843(a)(3), Obtaining a Controlled Substance by Deception; (2) waive his appeal rights, as detailed below; (3) cooperate with state medical licensing authorities, comply with any proposed

1

COURT EXHIBIT 1

sanctions from those authorities, and provide the relevant licensing authorities of any state in which he resides or works with a copy of this plea agreement and notification of any sanctions imposed by any licensing authority; (4) pay restitution for the drugs taken from the HOSPITAL, as described in the Stipulation of Facts below, and (5) pay restitution for all losses directly and proximately arising from the Emergency Department floods caused by the defendant, as described in the Stipulation of Facts below.

**B.      Government's Obligations**

2.      In exchange for the Defendant's plea of guilty and his waiver of appeal rights, the Government agrees to: (1) dismiss Counts One and Two of the Indictment, (2)  file no other federal criminal charges against the Defendant based on the stipulation of facts set forth below; (3) recommend a two-level reduction for acceptance of responsibility, pursuant to United States Sentencing Guidelines (U.S.S.G.) § 3E1.1, provided that the Defendant does not do anything that is inconsistent with accepting responsibility between and including the date of his guilty plea and the date of sentencing; and (4) not ask for an upward variance from the guideline range ultimately calculated by the Court.  This agreement does not provide any limitation of liability arising out of any acts of violence.

**C.      Defendant's Waiver of Appeal**

3.      The Defendant is aware that 18 U.S.C. § 3742 affords a defendant the right to appeal the sentence imposed. Understanding this and in exchange for the concessions made by the Government in this agreement, the Defendant knowingly

and voluntarily waives the right to appeal any matter in connection with this prosecution, conviction, or sentence unless it meets one of the following three criteria: (1) the sentence imposed is above the maximum penalty provided in the statute of conviction, (2) the sentence exceeds the advisory guideline range that applies to a total offense level of 10 (or, if the Defendant receives the two-level reduction for acceptance of responsibility, level 8), or (3) the Government appeals the sentence. Except as provided above, the Defendant also knowingly and voluntarily waives the right to appeal the manner in which the sentence is determined on grounds set forth in 18 U.S.C. § 3742.

4. The Defendant also knowingly and voluntarily waives his right to challenge this prosecution, conviction, or sentence and/or the manner in which it was determined in any collateral attack, including but not limited to a motion brought under 28 U.S.C. § 2255. The Defendant specifically waives on appeal or in a collateral attack any argument that the admitted conduct does not fall within the scope of the statute. This waiver provision, however, will not prevent the Defendant from seeking relief otherwise available if: (1) there is an explicitly retroactive change in the applicable Guidelines or sentencing statute, (2) there is a claim that the Defendant was denied the effective assistance of counsel, or (3) there is a claim of prosecutorial misconduct. Additionally, if the Government appeals the sentence imposed by the Court, the Defendant is released from this waiver provision. Should the plea of guilty be vacated on the motion of the Defendant, the Government may, in its sole discretion, move to reinstate any or all of the counts dismissed pursuant to

3

this agreement.

## II.   ELEMENTS OF THE OFFENSE

5.      The parties agree that the elements of the offense obtaining a

controlled substance by means of deceit, a violation of 21 U.S.C. § 843(a)(3),

are as follows:

      a.      *First,* that the Defendant obtained a controlled substance;

      b.    *Second*, that the controlled substance was obtained by means of misrepresentation, fraud, forgery, deceit, or subterfuge; and

      c.    *Third*, that the Defendant acted knowingly and intentionally.[1]

## III.   STATUTORY PENALTIES

6.      The maximum statutory penalties for violating 21 U.S.C. § 843(a)(3)

are not more than 4 years' imprisonment; a fine of not more than $250,000; not more

than 1 year of supervised release; a $100 special assessment, and restitution as

determined by the court. A violation of supervised release or probation may result in

a separate prison sentence and additional supervision.

7.      If probation or supervised release is imposed, a violation of any

condition of probation or supervised release may result in a separate prison

---

[1] Eric Wm. Ruschky, Pattern Jury Instructions for Federal Criminal Cases, District of South Carolina at 736 (2019 Online Edition).  *See, e.g., United States v. Wilbur* , 58 F.3d 1291, 1292 (8th Cir. 1995) ("focus of the statute is on how the defendant obtained the drugs"); *United States v. Wells*, 211 F.3d 988, 1000 (6th Cir. 2000); *United States v. Dumas*, 688 F.2d 84, 86 (10th Cir. 1982) (discussing statute's requirement that the controlled substance be obtained by "misrepresentation, fraud, forgery, deception, or subterfuge."

sentence and additional supervision.

## IV.    COLLATERAL CONSEQUENCES

8.      The conviction may cause the loss of civil rights, including but not limited to the rights to possess firearms, vote, hold elected office, and sit on a jury.

## V.    STIPULATION OF FACTS

9.      The parties agree that there is a factual basis for the guilty plea that the Defendant will tender pursuant to this Plea Agreement. That basis is set forth below. Because the Court must, as part of its sentencing methodology, compute the advisory Guidelines range for the offense of conviction, consider relevant conduct, and consider the other factors set forth in 18 U.S.C. § 3553, additional facts may be included below which are pertinent to those considerations and computations. To the extent the parties disagree about the facts set forth below, the stipulation of facts identifies which facts are known to be in dispute at the time of the execution of this Plea Agreement.

10.      This stipulation of facts does not preclude either party from hereafter presenting the Court with additional facts that do not contradict facts to which the parties have stipulated and that are relevant to the Court's guideline computations, to other 18 U.S.C. § 3553 factors, or to the Court's overall sentencing decision.

The parties agree as follows:

11.      The relevant conduct in this case began on May 8, 2019 and ended on September 26, 2019. Unless otherwise stated, the conduct below took place in

5

Denver, Colorado, which is in the State and District of Colorado.

12.     The Defendant was licensed as an Advanced Nurse Practitioner and as a Registered Nurse in the State of Colorado.  On May 8, 2019 he was placed at HOSPITAL, the identity of which is known to the parties, through HEALTH CARE STAFFING COMPANY, which is also known to the parties, as a contract nurse in HOSPITAL's Cardiac Catheterization Lab (the "Cath Lab").  The Cath Lab performed diagnostic and treatment services for patients suffering heart-related ailments, including heart attacks.

13.     Procedures in the Cath Lab frequently required medically necessary opiate pain relievers, such as fentanyl, or sedative benzodiazepines, such as midazolam (commonly distributed under the trade name Versed).  Anesthesia drugs like propofol were also sometimes used.  These drugs were stored in a Pyxis machine, which is an automated medication dispensing system used to securely store and document the dispensation of controlled substances.  To obtain drugs from the Pyxis machine a licensed practitioner would input a personal code to open the machine for a period of time and would then pull the necessary amount of medication. The Pyxis machine would then maintain a record of the amount of medication dispensed under that practitioner's code.  If a practitioner did not use the expected amount of medication for a procedure he or she would "waste" the unused medication in a designated receptacle and document the waste in the Pyxis machine.

14.     At all times relevant to this statement of facts, fentanyl was a schedule II controlled substance and midazolam was a schedule IV controlled substance. Propofol was not a controlled substance.

15.     After working at HOSPITAL for approximately two weeks, the defendant became aware that its procedures regarding the handling of controlled substances were looser than they had been at prior employers.  Beginning sometime around and between June 30, 2019 and September 11, 2019 he began intentionally and deliberately executing a plan to obtain fentanyl, midazolam (Versed) and propofol (collectively, the "drugs") for personal use through misrepresentations, fraud, deception, and subterfuge:

a.     The most common deceitful means through which the defendant obtained the drugs was to use his position as a nurse to falsely represent that he needed more drugs for a patient than was necessary.  The defendant would pull the excessive drugs from the Pyxis machine, knowing that they would not all be used.  He would then falsely document that the unused drugs were wasted when, in fact, he kept them for his personal use.

b.     At other times, the defendant used his position of trust to pull drugs for procedures that had not yet been assigned to him or for patients that had not yet even arrived for their procedures.  Under the false pretense of assisting his colleagues he would frequently arrive to work early, pull all of these medications and then keep for personal use whatever was not used for a patient.  By using this subterfuge, the defendant sought to hide, conceal and obfuscate the number of drugs

7

being used so that he could falsely claim that drugs pulled from the Pyxis machine under his identification number were actually used by colleagues.

      c.     On some occasions, the defendant falsely documented in patient charts that he had administered drugs that he did not actually administer.  These misrepresentations allowed him to deceitfully hide the fact that he was keeping drugs for personal use rather than using them for medically necessary procedures.

      d.     On still other occasions, the defendant exploited the fact that a colleague's entry of his or her personal identification number in the Pyxis machine would leave it open for a period of time.  After a colleague entered his or her number and obtained an appropriate number of medications the defendant would go to the "open" machine and pull an additional number of medically unnecessary medications, which would then falsely be logged as having been drawn by that colleague.  In this way the defendant was able to use deceit and subterfuge to conceal his acquisition of the drugs.

      e.     Finally, the defendant also took syringes filled with medication that were left behind by colleagues while those colleagues stepped away for other procedures or to use the restroom.  He would then use the drugs in those syringes for personal use. When the colleague asked what had happened to the drugs, the defendant would lie and say that he had used the drugs on a patient.

     16.    Using the means described above, the defendant obtained approximately 442 100mcg/200ml vials of fentanyl, 105.5 1mg/ml vials of midazolam HCL, 2.4 vials of 5mg/ml vials of midazolam, and 69 200mg vials of propofol under his

own identification number.  He took approximately 150 100mc/200ml vials of fentanyl under the identification numbers of others.  He took at least one syringe of fentanyl and at least ten syringes of propofol.

17.    Typically, the defendant used the drugs at the end of his shift at HOSPITAL, injecting them either while in the cath lab bathroom or in his truck in the HOSPITAL parking lot.  He would then drive home, sometimes while still under the influence of the drugs.

18.    On at least five occasions, the defendant used the drugs he obtained through misrepresentation, fraud, deception and subterfuge while still on duty, supervising the training of colleagues or actively involved in patient care.  Although no patients are known to have been harmed by this conduct, the defendant stipulates and agrees that this conduct created unacceptable risks to patients.

19.    In approximately August 2019 the defendant was assigned to train NURSE 1, whose identity is known to the parties.  During the time NURSE 1 was working with the defendant NURSE 1 observed unusual behavior:  the defendant would document excessive amounts of fentanyl and Versed in patient charges, would take excessively long bathroom breaks lasting between 30 and 90 minutes, and would return from the bathroom giggling, sweating, talking to himself and exhibiting a pale complexion.  On at least one occasion he was wearing an Ace bandage on his arm that was not present before he entered the bathroom.  In mid-September, 2019, NURSE 1 once pulled 2cc of fentanyl into a syringe and then went to the restroom. When NURSE 1 returned, the syringe was missing.  The defendant falsely told

NURSE 1 that he had administered it to a patient.  But NURSE 1 found no reference to this in the relevant chart.  NURSE 1 also observed the defendant pull from the Pyxis machine vials of fentanyl and Versed for patients scheduled to have procedures the next day.  The defendant wrapped the vials in a towel and put them into a cabinet. At that point, NURSE 1 reported the defendant's unusual behavior to a supervisor, NURSE 2, whose identity is known to the parties.

20.    On September 12, 2019, NURSE 2 was told that the defendant was needed by a medical provider.  NURSE 2 went to the cath lab bathroom, which was occupied by the defendant.  NURSE 2 told the defendant he was needed.  But the defendant stayed in the bathroom for approximately 20 more minutes.  After the defendant left, NURSE 2 entered the bathroom and found a fentanyl label on the floor and two empty 10cc syringes in the trashcan.  After this, NURSE 2 asked human resources at HOSPITAL to remove the defendant from patient care.

21.    At approximately 9:00 a.m. on September 17, 2019 NURSE 2 told the defendant to leave HOSPITAL and not to return until September 20, 2019.  About forty-five minutes later, NURSE 2 and HOSPITAL RISK MANAGER, whose identity is known to the parties, walked to the cath lab bathroom.  On the way, they observed the defendant coming in the opposite direction, away from the direction of that bathroom. Inside the bathroom trash can, NURSE 2 and HOSPITAL RISK MANAGER observed and collected two vials of fentanyl, a vial of propofol, two empty syringes, an orange rubber "tie off," and a paper towel that appeared to have blood on it.

10

22.     After using drugs in the cath lab bathroom the defendant frequently disposed of vials and syringes by flushing them down the toilet.  That toilet is serviced by a sump pump that also services HOSPITAL's Emergency Department.  On September 7, 2019 the Emergency Department flooded with sewage.  On September 10, 2019 it flooded again.  When plumbers were called to handle the second flood they found vials of fentanyl and syringes in the sump pump.  The defendant stipulates and agrees that he caused the floods in the Emergency Department by disposing of these items in the cath lab toilet.

23.     The defendant was interviewed by a special agent of the Food and Drug Administration's Office of Criminal Investigations ("FDA-OCI") and a Diversion Investigator from the Drug Enforcement Administration on September 26, 2019.  The defendant was not honest with the agents during the interview.  For example, he initially told the investigators that he left HOSPITAL because he did not get along with the charge nurse and because he had concerns about its handling of narcotics.  In fact, he left because he knew that the hospital suspected him of diverting drugs.  The FDA-OCI agent leading the interview warned the defendant that it was a crime to lie to a federal agent and admonished him to tell the truth if he wished to continue speaking with them.  After that, the Defendant admitted to taking fentanyl but otherwise continued to either excuse the seriousness of his conduct or to make false statements.  For example, the defendant was asked what drugs he took from the hospital and responded that "the only thing I took from [HOSPITAL] was propofol."  This was false and the defendant knew it was false when he said it.  As set forth

above, the defendant took fentanyl and midazolam (Versed), as well as propofol. Later in the interview, the defendant was asked whether he was taking drugs at work and responded "I wasn't taking it at work."  This was false and the defendant knew it was false when he said it.  In fact, as set forth above, he was taking drugs while working at HOSPITAL.

24.    Following the indictment in this case the defendant has worked with the authorities to alleviate concerns about the public health impacts of his conduct.  On June 16, 2020, the defendant voluntarily submitted himself to a polygraph examination in order to assist the government in its efforts to verify that patients were unharmed and medications were not tampered with.  During the interview the defendant admitted to his addiction problem, confirmed the amount of drugs he had taken from HOSPITAL and consistently denied any tampering.  This denial is consistent with the evidence gathered in the case, which does not show any tampering by the defendant.

## VI.    ADVISORY GUIDELINE COMPUTATION AND 3553 ADVISEMENT

25.    The parties understand that the imposition of a sentence in this matter is governed by 18 U.S.C. § 3553. In determining the particular sentence to be imposed, the Court is required to consider seven factors. One of those factors is the sentencing range computed by the Court under advisory Guidelines issued by the United States Sentencing Commission. In order to aid the Court in this regard, the parties set forth below their estimate of the advisory guideline range called for by the United States Sentencing Guidelines.

26.     The guideline calculation below is the good-faith estimate of the parties, but it is only an estimate. The parties understand the government has an independent obligation to assist the court in making an accurate determination of the correct guideline range, which means that the government is not precluded from making arguments in support of or against any estimate of the guideline range independently calculated by the Probation Office. *See United States v. Aragon*, 922 F.3d 1102, 1109 (10th Cir. 2019). To that end, the government, just like the Defendant, may make factual or legal arguments that affect the estimate below.

A.     Pursuant to U.S.S.G. § 2D2.2, the base offense level is 8;

B.     Pursuant to U.S.S.G. § 3B1.3, the Defendant should receive a two-level enhancement for abusing his position and skills as a nurse.

C.     The adjusted offense level is therefore 10.

D.     Acceptance of Responsibility:  Provided the Defendant does nothing inconsistent with acceptance of responsibility between the date of the change of plea hearing and the date of the sentencing hearing, the Defendant should receive a 2-level downward adjustment, pursuant to U.S.S.G §§ 3E.1.1(a). The resulting offense level would be 8.

E.     Criminal History Category: The parties understand that the Defendant's criminal history computation is tentative. The criminal history category is determined by the Court based on the Defendant's prior convictions. Based on information currently available to the parties, it is estimated that the Defendant's criminal history

13

category would be **Category I,** as the Defendant has no criminal history.

F.      Assuming the (tentative) criminal history set forth above, the career offender/criminal livelihood/armed career criminal adjustments pursuant to U.S.S.G. § 4B1.1 - § 4B1.4 would not apply.

G.      Imprisonment: The advisory guideline range resulting from these calculations — an offense level of 8 at Criminal History Category 1 — is 0-6 months of imprisonment. However, in order to be as accurate as possible, with the criminal history category undetermined at this time, the estimated offense level of 8 set forth above could conceivably result in a range from 0 months (bottom of Category I), to 24 months (top of Category VI).

H.      Fine: The Government will not seek a fine in this case. However, the parties understand that pursuant to U.S.S.G. § 5E1.2, assuming the estimated offense level of 8 set forth above, the fine range for this offense would be $2,000 to $20,000, plus applicable interest and penalties and the Court may impose a fine.

I.      Supervised Release: Pursuant to U.S.S.G. § 5D1.2, if the Court imposes a term of supervised release, that term may not be more than 1 year.

27.      Restitution: The defendant agrees, pursuant to 18 U.S.C. § 3663A and § 3663(a) to pay restitution for the drugs taken from HOSPITAL described in the Stipulation of Facts and to pay restitution for losses directly and proximately caused by the floods of the Emergency Department described in the Stipulation of Facts, in an amount to be determined by the Court.  The defendant further understands that,

14

pursuant to 18 U.S.C. §§ 3563(b) and 3583(d), the Court may impose restitution as a condition of probation or supervised release in an amount to be determined by the Court.

28.     The parties understand that although the Court will consider the parties' estimate, the Court must make its own determination of the guideline range. In doing so, the Court is not bound by the position of any party.

29.     No estimate by the parties regarding the guideline range precludes the Defendant from asking the Court to vary entirely from the advisory Guidelines and to impose a non-guideline sentence based on other 18 U.S.C. § 3553 factors.

30.     The parties understand that the Court is free, upon consideration and proper application of all 18 U.S.C. § 3553 factors, to impose that reasonable sentence which it deems appropriate in the exercise of its discretion and that such sentence may be less than that called for by the advisory Guidelines (in length or form), within the advisory Guidelines range, or above the advisory Guidelines range up to and including imprisonment for the statutory maximum term, regardless of any computation or position of any party on any 18 U.S.C. § 3553 factor.

## VII. ENTIRE AGREEMENT

31.     This Plea Agreement states the parties' entire agreement. There are no other promises, agreements (or "side agreements"), terms, conditions, understandings, or assurances, express or implied. In entering this Plea Agreement, neither the Government nor the Defendant has relied, or is relying, on any terms,

promises, conditions, or assurances not expressly stated in this agreement.

Date: 5/05/2021

_____
KURT VASQUEZ
Defendant

Date: May 5 2021

_____
Joseph Saint-Veltri, Esq.
Attorney for Defendant

Date: _____

_____
Bryan David Fields
Assistant United States Attorney